# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| George J. Athanas, | : | Case No. 1:08CV1096 |
| | : | |
| Plaintiff | : | Judge James S. Gwin |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Commissioner of Social Security, | : | |
| | : | **REPORT AND RECOMMENDED** |
| Defendant | : | **DECISION** |

This action pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) seeking judicial review of defendant's final determination denying plaintiff's claims for disability benefits, (DIB), 42 U.S.C. §§416, 423 and supplemental security income benefits (SSI), 42 U.S.C. §1381 et seq.,[1] is pending decision upon the parties' submissions on the merits, pursuant to which plaintiff seeks entry of final judgment in his favor and defendant seeks final judgment upholding the decision below.

Plaintiff's right to benefits under both programs is dependent upon a showing that he is disabled, as that term is defined in the Social Security Act.  Disability is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for not less than 12 months."  42 U.S.C. §§423(d)(1), 1383c(a).  The programs differ with regard

---

[1]Plaintiff's submission only references the application for DIB.  As it is clear that he applied for, and was denied, DIB and SSI it must be assumed that he is seeking judicial review of both denials.

to other qualifying criteria.  The disability benefits statute requires "fully insured" status, which focuses on the period of time the claimant has worked while covered by Social Security.  The SSI program focuses on income and resources as basic eligibility factors.

Plaintiff's applications were filed on June 22, 2004, each claiming an onset date of November 29, 2002.  Although the record is certified as "full and accurate" it does not contain a copy of a Disability Report-Adult which, in this Court's experience, is normally completed by (or on behalf of) an applicant at the time of application and contains a statement of the applicant's alleged disabling impairments and the manner in which those impairments limit the applicant's ability to engage in substantial gainful work activity.  This being so, this Court does not know the basis upon which the plaintiff asserted he was disabled.

Upon denial of the plaintiff's claims at the state agency level hearing <u>de novo</u> before an Administrative Law Judge (ALJ) was requested, and a hearing pursuant thereto was convened on February 2, 2007.  However, it did not go forward, as plaintiff's counsel requested "the opportunity to have him sent for a consultative exam for gas exchange, given his asbestosis and the fact that there's a dearth of that information in file."[2]

It does not appear that such a consultative examination occurred.  However, on June 12, 2007 the plaintiff was admitted to the EMH Regional Medical Center through the emergency room with complaints of shortness of breath for the last three or four days.  During the course of his five day hospitalization the primary investigation was of cardiovascular consideration, and the primary discharge diagnosis was "congestive heart failure, unspecified."  There is virtually nothing in the record of that hospitalization bearing upon his respiratory complaints.

_____

[2]This fact is omitted in both plaintiff's and defendant's briefs.

The de novo hearing was reconvened on July 30, 2007.  Testifying at the proceeding were the plaintiff and a vocational expert, Dr. Nancy Borgeson.

At the hearing the plaintiff ascribed his professed inability to work to a combination of physical and emotional factors.

On the physical side he testified:

> Q.  George, why don't we just get right down to it.  Why don't you tell us about your physical condition?
>
> A.  I find myself even just doing—cutting grass, okay, if I was to cut the grass—I'll tell you, I'll give you an example, cutting my mom's front yard.  I would have to take a break three times, where normally I could go right through it.  I have problems breathing.  If I start even walking, like going on a set of steps, I it's like I'm losing my breath.
>
> Q.  How many stairs can you take before you start losing your breath?
>
> A.  I'd say about seven, eight stairs, and then all of a sudden, you know, it's just like—then I have to pull on the side, where normally I would never do anything like that.
>
> Q.  Okay.  How about if you're just standing for a while?  Will you lose your breath then?
>
> A.  It depends on the weather sometimes.  I have lost it.  Okay.  I's not as much as I do when I'm walking or going up a set of stairs. It's if I'm talking sometimes I lose—I would have to try to catch it.
>
> Q.  How far can you walk before you lose your breath enough where you have to take a rest?
>
> A.  I'd say about a block.
>
> Q.  And then how long do you have to rest?
>
> A.  I sit down for like five, ten, sometimes 15 minutes, and I'm okay. If I have—there's times—I have  a  history  of  an  irregular

3

heartbeat.  Sometimes when I have this attack, when it gets me, it used to be where I could just lay down for like ten, 15 minutes, take deep breaths, and it goes away, I guess.  Go back down to normal.  Just recently, I was hospitalized.  I didn't have any insurance, but the hospital decided it was better for me to go in the hospital and—there's times where this irregular heartbeat starts coming where it takes me—okay, I'll give you an example. Yesterday I had one.  I was helping my daughter and my grandkids putting a swing together.  And it lasted just about the whole day, because I couldn't—I didn't lay down and take a rest, or anything like that.  When I finally did lay down, I laid down for like 15-20 minutes.  It went back down to normal.  I mean, there's things that it gets frustrating and I get upset sometimes. And I even get to my depressed state sometimes where I can't do things like I used to.  It's not like—I know I can't be expected to do things like I was when I was younger, but something like as far as working, I've worked my whole life.

Q.  Well, what's your—when you start getting out of breath, what's your energy level like?

A.  I lose it.  I lose my energy level.  It's like I'm drained.

Q.  Do you have to lie down during the day?

A.  Oh, yeah.  I do.

When asked by his counsel whether he used a bronchodilator or inhaler and the medical treatment he had sought the plaintiff responded:

A.  I can't afford it.  I mean, when I was in the hospital they gave me something.  They gave me some prescriptions, but that wasn't one of them.  It costs $200 and some dollars, and I don't have the money for it, so I didn't get it.

Q.  There's not a lot of records in your file on both your emotional impairment and your breathing impairment.  You've sought care for those.

A.  I go and I try, okay.  And I tell them I have no insurance and no income.  And they start giving me—and I know it's the runaround.  And I'm not accustomed to asking people to, you know, for anything for free, so they tell me, well, you know, you

4

have to do this or do that, or you have to come up with some money, so I just leave it alone, because I already know who, you know, what's [sic] it's about.  It's the money.

Q.  How long have you been without insurance?

A.  For 13 years.

Moving on to the emotional side, the plaintiff testified:

A.  Well, I get very—when I'm not able to work and do things like I used to—not even like I used to, or somewhat, and I can't do it, it's—I shut myself up on people, because I feel sometimes ashamed, embarrassed, and I get really depressed, like I feel like I'm a lazy bum sometimes, okay, because I'm not able to do things like I used to.  And then I'm not able to take care of myself, you know, financially or—then I'm wondering sometimes how will it be seven, eight years from now?  Okay.

Q.  You live with your mom and your sister now.  Right?

A.  Yeah.

Q.  How do you get along with them?

A.  We get along okay, but mostly it's like I take it out on them sometimes, okay, with the way—so I just will shut myself in the room.  I get depressed.

Q.  Do you still have the crying spells?

A.  Yeah.

Q.  How often?

A.  Well, even now, you know, when I talk about it, it's hard.  I started working when I was 13 years old at a restaurant, then a newspaper job.  When I turned 18, I was a hard worker.  I'm not used to being without it.  I'm not used to—I worked.  It's part of my life.  And now I'm not able to, so it makes me feel like I've got very low esteem.  I feel like I—

Q.  Do you leave the house much?

5

A.   No.

On August 29, 2007 the ALJ entered his decision finding the plaintiff not disabled, which stands as the defendant's final determination consequent to denial of review by the Appeals Council on April 1, 2008.  The headings of the ALJ's "Findings of Fact and Conclusions of Law" were:

1.  The claimant met the insured status requirements of the Social Security Act through September 30, 2004.[3]

2.  The claimant has not engaged in substantial gainful activity since November 29, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: chronic obstructive pulmonary disease (Exhibit 1F, 2F, 8F), a major depressive disorder (Exhibit 5F), and a substance abuse disorder in remission (Exhibit 4F, 5F) (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  The claimant retains the residual functional capacity to perform a range of light work.  Specifically he can sit, stand and/or walk for 6 hours each in an 8-hour workday and can lift, carry, push and/or pull 10 pounds frequently and 20 pounds occasionally. He must avoid even moderate exposure to fumes, odors, dust, gasses and poorly ventilated areas and also must avoid even moderate exposure to temperature extremes (more than 85 degrees or less than 32 degrees Fahrenheit).  He is limited to simple, routine, low-stress tasks and is precluded from tasks that involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

---

[3]Because the plaintiff's eligibility for DIB only extended to that date while his eligibility for SSI continued thereafter the extent to which the medical evidence was probative of his condition as of and after September 30, 2004 could be a critical consideration vis-a-vis the two different benefit programs.  The ALJ did not address the question of possible distinctions on the evidence before and after that date, as he found that the plaintiff was not disabled at any time after his claimed onset date.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on January 4, 2953.  He was 49 years old, a "younger" individual (20 CFR 404.5163 and 416.963), on the day his disability alleged [sic] began, and is 54 years old, "approaching advanced age," as this decision is issued.

8.  The claimant has a "limited," 11th grade education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from November 29, 2002 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

On this appeal the two issues presented by the plaintiff are broadly postulated as "Whether the Administrative Law Judge ('ALJ') adequately reviewed the case record and used a correct legal standard resulting in a decision that was supported by substantial evidence" and "Whether the ALJ failed to properly assess the extent of the emotional impairment suffered by the plaintiff."

A focal point of plaintiff's position on this appeal is a psychological evaluation of the plaintiff by Dr. Deborah Koricke, a clinical psychologist, performed upon referral by the Bureau of Disability Determination in January 2005.  Dr. Koricke found the plaintiff to be suffering from major depression, and assigned him a GAF of 45, the mid-point of "Serious symptoms. . .any serious impairment in. . .occupational. . .functioning (e.g. . . .unable to keep a job)."  Under the heading of

"Discussion of the Four Work-Related Mental Abilities" Dr. Koricke stated:

1.  The claimant's mental ability to relate to others, including fellow workers and supervisors, is <u>markedly impaired</u> due to his symptoms of Major Depression.  Today, George had some difficulty with social interactions due to being socially withdrawn and depressed.  In the past, his depression and anger has led to him walking off of a 23 year position with Ford Motor Company.

2.  The claimant's mental ability to understand, remember and follow instructions is moderately impaired by his emotional distress.  While he is likely functioning within the estimated low average range of ability, his ability to remember and follow instructions is likely impaired due to his attention deficits and depressive symptoms. His lack of attention makes it difficult for him to fully understand directives and remember what he has been told.  He would likely have difficulty understanding what needs to be done in the work place and rarely follow through with completing tasks.

3.  The claimant's mental ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks is <u>markedly impaired</u> at this time.  His lack of attention is viewed a function of his major depression.

4.  The claimant's mental ability to withstand the stress and pressures associated with day-to-day work activity is <u>markedly impaired</u> due to his symptoms of Major Depression.  He does show marked impairment in the area of relating and his ability to maintain his attention, concentration, and pace/persistence, as well as in his ability to understand, remember and follow simple instructions.   <u>In sum, Mr. Athanas is not viewed able to withstand the stress and pressures of working on a daily basis.</u>

(Emphasis added.)  This evaluation certainly supports the argument that the plaintiff suffers from a mental impairment of disabling severity.

This Court has a great deal of difficulty with the ALJ's rationale for discounting Dr. Koricke's assessment of the plaintiff's mental/emotional status.  He stated:

I give Dr. Koricke's opinion that Mr. Athanas is markedly impaired

8

in his ability to relate to others minimal weight. Although he has depression, he lives with his mother and he attends AA meetings. He testified that he gets along with his mother and sister.

Dr. Koricke also opined that he was markedly impaired in his ability to maintain attention, concentration, persistence and pace sufficient to perform simple repetitive tasks. However, he indicted that he was good at home improvement jobs one month prior to her evaluation (Exhibit 4F, 7).

She opined that he was markedly impaired in his ability to withstand the stress and pressures associated with day-to-day work activity. Dr. Koricke's opinion was based on one evaluation without consideration of counseling that he started only one month prior to her evaluation (Exhibit 5F, 2).

This Court sees no relationship between living with and getting along with a mother and sister and/or attending AA meetings with the ability to relate to fellow workers and supervisors in an employment setting.

The comment regarding being good at home improvement jobs is found in an unsigned Diagnostic Assessment from a community mental health facility that the plaintiff checked himself into in December 2004 with "complaints including feeling worthless, useless and suicidal ideation." That same document states that the plaintiff reported "his physical and mental health have made it difficult to accomplish tasks." In this Court's opinion, to seize upon the plaintiff's statement that he had skills or talents in the area of home improvement jobs as evidence that he could engage in regular work activities is a prime example of fly-specking.

While it may be true that Dr. Koricke's assessment was a one time evaluation it is also true, as plaintiff contends, that it is the only expression of opinion from a mental health professional.

The foregoing is not the only problem this Court has with the ALJ's decision vis-a-vis the plaintiff's mental status.

Therein the ALJ made the conclusory statement "In activities of daily living Mr. Athanas has moderate restrictions." That is followed by "His feelings of depression contribute to his inability to care for himself. He remains in his bed clothing several days per week." This Court does not consider being unable to care for oneself and not getting dressed several days a week as commensurate with being moderately restricted.

There are further similar inconsistencies in the ALJ's decision. He stated that the plaintiff has moderate difficulties in social functioning, which is followed by "He is withdrawn and avoids interaction with people. He lacks interest in activities and exhibits symptoms of anhedonia."[4] He also stated "With regard to concentration, persistence or pace, Mr. Athanas has moderate difficulties," which is followed by "During a psychological evaluation, he was noted to show significant attention deficits."

On the physical side the ALJ took it upon himself to interpret the significance of the objective medical evidence as it bears upon the plaintiff's complaints of shortness of breath and chronic fatigue. This Court, possessing the same level of "medical expertise" as does the ALJ has no idea of whether the ALJ was right or wrong. In this Court's opinion this was not a case where the ALJ, as trier of the facts, should have been "playing doctor," Rather, this was a case that called for the benefit of testimony from a medical expert in order to reach a properly informed decision.

It is apparent from the foregoing that this Court believes that the defendant's final determination cannot stand. However, this Court is not satisfied that the fact that the ALJ's decision is poorly reasoned entitles the plaintiff to a final judgment finding that he is disabled and entitled to an award of DIB and/or SSI, particularly considering that in order to be entitled to DIB the

---

[4]Anhedonia is "total loss of feeling of pleasure in acts that normally give pleasure." Dorland's Illustrated Medical Dictionary (30th Ed.), p. 90.

10

objective medical evidence must establish disability no later than September 30, 2004.  In this

Court's opinion the matter should be remanded to the defendant pursuant to the fourth sentence of

§405(g) for further proceedings, at which testimony is taken from expert witnesses qualified to speak

to both the plaintiff's alleged psychological and physical impairments, and it is recommended that

such an order be entered.


                                                                    s/DAVID S. PERELMAN
                                                                    United States Magistrate Judge


DATE:    March 16, 2009


## OBJECTIONS

        Any objections to this Report and Recommended Decision must be filed with the Clerk of
Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified
time waives the right to appeal the District Court's order.  *See, United States v. Walters*, 638 F.2d
947 (6th Cir. 1981).  *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111
(1986).